1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11    UNITED STATES OF AMERICA,              No.  2:22-cr-00083-TLN

12               Plaintiff,

13         v.                                **ORDER**

14    NICHOLAS D. GRAY,

15               Defendant.

16

17         This matter is before the Court on Defendant Nicholas D. Gray's ("Defendant") Motion to

18    Suppress Evidence.  (ECF No. 36).  The Government filed an opposition, and Defendant filed a

19    reply.  (ECF Nos. 39, 40.)  For the reasons set forth below, Defendant's Motion to Suppress

20    Evidence is GRANTED.

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

1

1        **I.        FACTUAL AND PROCEDURAL BACKGROUND**

2              The underlying facts in the instant case are undisputed, and the parties agree no

3    evidentiary hearing is required.  (*See* ECF No. 36 at 3–7; ECF No. 39 at 2–5.)  In addition to their

4    moving papers, the parties lodged video copies of the footage from both Officer Brown's and

5    Officer Ratcliffe's body worn cameras ("BWC") and accompanying transcripts.  (Brown BWC

6    and Ratcliffe BWC.)  The following factual findings are taken from the accepted facts in the

7    moving papers and BWC footage.  The Court incorporates the entirety of the Brown BWC and

8    the Ratcliffe BWC footage into these factual findings.

9              On March 31, 2022, Officers Brown and Ratcliffe responded to a call at 741 Carella

10   Drive in South Sacramento.  (ECF No. 36 at 4; ECF No. 39 at 2.)  Officer Brown approached the

11   residence followed by Officer Ratcliffe several minutes later, and spoke with Amanda Reyna

12   ("Ms. Reyna"), who answered the door with her young toddler.  (*Id.*)  During this encounter, Ms.

13   Reyna stood in the doorway to the residence while the officers stood outside a closed picket gate

14   a few feet from the door.  (ECF No. 36 at 4.)  Ms. Reyna was wearing comfortable looking

15   clothing including sweatpants, t-shirt, white socks, and no shoes.  (Brown BWC at 1:13.)  Officer

16   Brown learned Ms. Reyna called her mother regarding a domestic dispute with Defendant, and

17   her mother subsequently called the police.  (ECF No. 39 at 2.)  Ms. Reyna did not report any

18   injuries, however, she did state Defendant took her phone and threw it on the floor.  (ECF No. 36

19   at 4; ECF No. 39 at 2.)  Ms. Reyna also informed Officer Brown that Defendant packed up

20   firearms, left the house, and drove to a storage unit location with a bag of guns.  (*Id.*)  Ms. Reyna

21   further informed the officers Defendant is a convicted felon who was not supposed to have

22   firearms, but nonetheless manufactured and possessed them.  (*Id.*)

23             The officers spoke with Ms. Reyna about the domestic disturbance.  (ECF No. 39 at 2.)

24   They discussed how Ms. Reyna should obtain a restraining order against Defendant and about her

25   need to leave him.  (*Id.*)  The officers provided recommendations to Ms. Reyna about obtaining a

26   restraining order, navigating issues of child custody, and recommended she call the police if and

27   when she needed to come back to the house when Defendant is home.  (*Id.*; *see also* Brown BWC

28   1:13–17:48.)  Ms. Reyna informed the officers Defendant was driving a 2004 Porsche rented

2

1    through the Turo app.  (Brown BWC at 6:44.)  The officers learned Defendant used this vehicle to

2    transport the firearms to one or more of his storage units in Woodland, California.  (*Id.* at 6:37–

3    7:41.)

4           Several minutes into the conversation, Officer Ratcliffe inquired if he could enter the

5    house, asking "can we take a look at that real quick," to which Ms. Reyna responds, "I don't want

6    to let you in . . . because this is his house and that would just be even worse for me . . . I don't

7    know what it would do for me to let you in."  (ECF No. 36 at 4; ECF No. 39 at 3.)  As the

8    conversation proceeded, Officer Ratcliffe continued to speak with Ms. Reyna about allowing the

9    officers to enter the home.  (ECF No. 36 at 4.)  At this time, Ms. Reyna did not give consent to

10   enter.  Officer Ratcliffe began discussing his concern about the guns in the community, about

11   Defendant's alleged drug use, and explains "the only reason why I asked to come in is just to get

12   an idea of possibly maybe some of the stuff he's doing…[o]r maybe there's a receipt in there for

13   a storage unit out in Woodland."  (Brown BWC at 9:43–11:06.)  Again, Ms. Reyna did not

14   consent to a search.

15          Officer Ratcliffe stepped away and Officer Brown continued to discuss with Ms. Reyna

16   her current situation.  (Brown BWC at 12:59–17:14.)  The officers then discussed with Ms. Reyna

17   the status of her phone.  The Court notes throughout this encounter Ms. Reyna appeared a bit

18   disoriented and provided confusing and sometimes conflicting statements about the location and

19   status of her two phones.  (*See, e.g.*, Brown BWC at 4:11, 4:44, 12:25, 20:47, 21:45.)  The

20   officers proceeded to help Ms. Reyna call her mother and were present for their conversation.

21   (*Id.* at 21:37–25:28.)

22          A couple minutes after Ms. Reyna finished speaking with her mother, Officer Ratcliffe

23   asked once more to look in the residence, stating:

24              I'd really like to just take a look in the house real quick.  I'm not
                going to go search anything, but I'd like to just take a look around to
25              make sure that there's nothing obvious that strikes me as a huge
                concern.  Would that be okay with you?  It's not going to be super
26              invasive.  I just want to take a peek in the house.

27   (*Id.* at 27:48.)  After hearing this limited request to enter, Ms. Reyna consented, responding "[a]ll

28   right."  (*Id.* at 28:11.)

                                                       3

1    Once inside the residence, the officers looked around as Ms. Reyna showed them each

2    room.  The Officers requested additional consent to search specific locations and containers.

3    When entering a room containing airsoft items and the words "Game Room" on the wall (the

4    "Game Room"), Officer Ratcliffe observed an airsoft pistol and asked "[d]o you mind if I just see

5    if that's real or not" before picking it up.  (*Id.* at 28:58.)  While looking in a closed container in

6    the Game Room, Officer Ratcliffe asked "[i]s it cool with you if we do that" to which Ms. Reyna

7    replied, "[y]es."  (*Id.* at 29:22–23.)

8    Several minutes after entering the residence, Officer Ratcliffe went into the Game Room

9    for a second time.  (Ratcliffe BWC 29:18.)  While Officer Ratcliffe was in the Game Room, Ms.

10   Reyna was standing in the hall outside the Game Room speaking with Officer Brown.  (*Id.*)

11   During the entire time Officer Ratcliffe was in the Game Room, Ms. Reyna remained outside the

12   room in the hallway, with no view into the Game Room.  (Brown BWC at 32:34–34:11.)  As

13   Officer Ratcliffe exited the Game Room, he appeared to notice a pile of clothing in the corner.

14   (Ratcliffe BWC at 30:14.)  The clothing was covering a box.  (*Id.* at 30:16.)  Sandwiched between

15   the clothing pile and the box, a white sheet of paper with a crease in the middle and no visible

16   print or writing on it was sticking out.  (*Id.*)  Upon seeing this, Officer Ratcliffe bent down,

17   moved several articles of clothing, picked up the piece of paper, read it, and photographed it.  (*Id.*

18   at 30:16–30:46.)  On the top right side, the paper read: "Receipt."  (*Id.* at 30:21.)  Officer

19   Ratcliffe, then dropped the paper back onto the box and began searching the box, a bag next to

20   the box, and the surrounding clothing.  (*Id.* at 30:46–31:20.)  From the time Officer Ratcliffe saw

21   the paper until he concluded the search and exited the Game Room, Ms. Reyna was in the

22   hallway speaking with Officer Brown with no view of Officer Ratcliffe's searches.  (Brown BWC

23   at 32:48–34:23.)

24   Ms. Reyna then led the officers to the living room/kitchen area, opened the garage door

25   for Officer Ratcliffe, and Officer Ratcliffe entered the garage.  (Ratcliffe BWC at 32:00–32:07.)

26   The moment Ms. Reyna opened the garage door, her infant began to cry, and she went to comfort

27   the child.  (*Id.* at 32:05.)  Officer Ratcliffe remained in the garage where he proceeded to search,

28   picking up bags to view their contents, taking photos, moving cardboard boxes to see what was

1    behind them, and opening containers.  (*Id.* at 32:05–37:56.)  During the entire time Officer

2    Ratcliffe was in the garage, Ms. Reyna was inside the house taking care of her child and speaking

3    with Officer Brown.  (Brown BWC 35:21–41:12.)

4         Later that day, Officer Ryan Oliver obtained a warrant to search Defendant's storage unit.

5    (ECF No. 36 at 6; ECF No. 39, Exhibit 1.)  The warrant provided for the search of Defendant's

6    storage unit at 1520 East Main Street, Unit 647, in Woodland California, Defendant's person, and

7    Defendant's rental Porsche Carrera with California license plate 8YHR315.  (ECF No. 39,

8    Exhibit 1 at 2–3.)  Attached to the warrant was Officer Oliver's affidavit in support of the

9    warrant.  (*Id.* at 7–19.)  Central to Officer Oliver's affidavit was the receipt found by Officer

10   Ratcliffe at Defendant's residence and other information obtained through the search of the

11   residence.  (*Id.* 10–13.)  The receipt appears to be the only evidence that led officers to

12   Defendant's storage unit at 1520 East Main Street in Woodland, California.  Inside Defendant's

13   storage unit, officers found two commercially manufactured firearms.  (ECF No. 39 at 5.)  Inside

14   Defendant's rental Porsche, officers found an AR-15 style lower receiver, seven privately

15   manufactured firearms, and ammunition.  (*Id.*)  Defendant was subsequently arrested and charged

16   with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 9.)

17        **II.    STANDARD OF LAW**

18        The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons,

19   houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.

20   Searches conducted without a warrant "are per se unreasonable under the Fourth Amendment–

21   subject only to a few specifically established and well-delineated exceptions."  *Katz v. United*

22   *States*, 389 U.S. 347, 357 (1967).  Those exceptions include consent.  *Morgan v. United States*,

23   323 F.3d 776, 781 (9th Cir. 2003).  Consent can be express or implied, but it must be

24   "unequivocal and specific."  *United States v. Basher*, 629 F.3d 1161, 1167–68 (9th Cir. 2011).

25        In the case of a warrantless search or seizure, the Government bears the burden of

26   proving, by a preponderance of the evidence, that the warrantless search or seizure falls within an

27   exception to the warrant requirement.  *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir.

28   2001); *see also United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987) ("The [G]overnment

                                        5

1  must prove the existence of an exception to the Fourth Amendment Warrant Requirement by a

2  preponderance of evidence.").

3  **III.   ANALYSIS**

4       Defendant moves to suppress evidence obtained from the search of his residence on

5  March 31, 2022, and all fruits of this search, including the subsequent searches with a warrant of

6  his storage unit, car, and person.  (ECF No. 36.)  Defendant raises three arguments in support of

7  his motion: (1) Ms. Reyna did not give voluntary consent for the officers to enter and search the

8  residence; (2) Ms. Reyna lacked apparent authority to consent to a search of the room where the

9  receipt was found; and (3) even assuming consent to enter the residence was voluntarily given

10  and Ms. Reyna had apparent authority to provide such consent, Officer Ratcliffe's exceeded the

11  scope of Ms. Reyna's consent.

12       The Government opposes the motion.  In opposition, the Government argues: (1) Ms.

13  Reyna had actual and apparent authority to consent; (2) Ms. Reyna voluntarily consented to the

14  search; (3) Officer Ratcliffe did not exceed the scope of the search; (4) even if Ms. Reyna's

15  consent was unsound or Officer Ratcliffe exceeded the scope of consent, the evidence should not

16  be excluded pursuant to the good faith exception; and (5) even if Ms. Reyna's consent was

17  unsound or Officer Ratcliffe exceeded the scope of consent, the evidence should not be

18  suppressed because it would have been inevitably discovered.  (ECF No. 39.)  The Court

19  addresses the parties' arguments in turn.

20            A.    Ms. Reyna had Apparent Authority to Provide Consent

21       The Court begins with the issue of apparent authority.  "The Fourth Amendment

22  recognizes a valid warrantless entry and search of premises when police obtain the voluntary

23  consent of an occupant who shares, or is reasonably believed to share, authority over the area in

24  common with a co-occupant who later objects to the use of evidence so obtained."  *Georgia v.*

25  *Randolph*, 547 U.S. 103, 106 (2006) (citing *Illinois v. Rodriguez,* 497 U.S. 177 (1990)); *United*

26  *States v. Matlock*, 415 U.S. 164 (1974)).  The warrantless entry prohibition does not apply to

27  "situations in which voluntary consent has been obtained, either from the individual whose

28  property is searched . . . or from a third party who possesses common authority over the

premises." *Rodriguez,* 497 U.S. at 181.

Defendant challenges Ms. Reyna's authority to consent to a search of the residence generally.  (ECF No. 36 at 10, 11.)  Defendant argues Ms. Reyna's statements that "I don't want to let you in" and "this is his house" demonstrated she was only a proxy for Defendant and did not have apparent authority to consent.  (*Id.* at 10.)  The Court disagrees.

The genesis of the officers arriving to the residence was an alleged domestic dispute. Upon arrival at the residence, Officer Brown encountered Ms. Reyna who was holding her infant child inside the residence.  (Brown BWC at 1:13.)  During the conversation that ensued, Ms. Reyna stated, "we've been living together," "[h]e just bought this house. . . we just moved in." (ECF No. 39 at 8.)  As the Government notes in its opposition, Ms. Reyna was wearing comfortable clothing, did not have shoes on, and appeared, based on the BWC footage to be residing there.  (*Id.*)  Based on the purpose of the initial 911 call, Ms. Reyna's statements and appearance, and the general scene presently before the officers, it was reasonable for the officers to conclude Ms. Reyna was a co-occupant with common authority over the residence. Accordingly, the Court finds Ms. Reyna had apparently authority to provide consent to a search of the residence.[1]

B.    Ms. Reyna's Consent was Not Voluntary

Given that Ms. Reyna had apparent authority to consent to a search of the residence, the Court now addresses whether Ms. Reyna voluntarily provided consent.  To establish the validity of consent to search, "the government bears the heavy burden of demonstrating that the consent was freely and voluntarily given."  *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997).  "Among the factors that tend to show a lack of voluntariness are: (1) the person was in custody; (2) the officer had his weapon drawn; (3) the officer failed to administer *Miranda* warnings; (4) the officer did not inform the person of his right to refuse to consent; and (5) the

---

[1]    Defendant also argues Ms. Reyna lacked apparent authority to consent to a search of the Game Room.  (ECF No. 36 at 12.)  However, because the Court finds Ms. Reyna did not provide voluntary consent to enter or search the residence as a whole, as outlined subsequently, the Court need not reach the narrower issue of whether Ms. Reyna had apparent authority to consent to search the Game Room specifically.

1   person was told that a search warrant could be obtained." *Id.* These factors, however, are not

2   dispositive: "[w]hether consent to search was voluntarily given or not is 'to be determined from

3   the totality of all the circumstances.'" *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227

4   (1973)).

5          Defendant argues Ms. Reyna's consent to search the premises was not voluntary. (ECF

6   No. 36 at 9.) Specifically, Defendant argues Ms. Reyna's alleged consent "came 20 minutes after

7   [she][] repeatedly declined to let them inside, after she made it clear that the house was 'his,' and

8   after she gave the officers reason to believe that she lacked authority to consent to a search." (*Id.*)

9   Defendant is correct that Ms. Reyna's encounter with the officers prior to their entry lasted

10  approximately 20 minutes. This is demonstrated most clearly by the body worn camera video.

11  Defendant is also correct that prior to Ms. Reyna finally allowing the officers into the residence

12  she, at least once, declined to give consent. These facts, however, do not automatically render her

13  subsequent consent involuntary. Instead, the Court looks at the totality of circumstances, guided

14  by the factors outlined above.

15         At the time Ms. Reyna told Officer Ratcliff that he could enter the residence to "take a

16  look in the house real quick," she was not in custody, the officers did not have their weapons

17  drawn or exert any implied intimidation.[2] These facts weigh in favor of voluntariness. However,

18  at no point during Ms. Reyna's conversation with the officers did either Officer Brown or Officer

19  Ratcliffe clearly inform her of her right to refuse. At most, Officer Ratcliffe stated "it is up to

20  you." (Brown BWC at 12:12.) This statement, though seemingly clear in insolated text, was

21  significantly less clear in reality. Officer Ratcliffe's entire statement was:

22             I'm going to go grab my phone. If you're interested, Officer Brown
               could come in and take a look. It's up to you. I'll go grab that phone
23             and I'll give Nancy a call and then we will see about getting you to
               where you feel a bit more safe. Do you have stuff packed up? Are
24             you ready to go?

25   _____

26   [2]      Whether the officers provided Ms. Reyna with a *Miranda* warning or informed her a
     search warrant could be obtained are less relevant factors in the instant case. This is because Ms.
27   Reyna is not the Defendant here, the officers were not investigating her conduct, nor was she a
     person of interest in an active investigation. Accordingly, these two factors are neutral and carry
28   minimal weight in the Court's analysis.

(*Id.* at 12:12– 12:23.)  The lack of clarity of this statement is evident by Ms. Reyna's response, "I was looking for my phone."  (*Id.* at 12:25.)  Ms. Reyna neither agreed to the requested search nor responded to the Officer's inquiry about her belongings being packed.  In fact, her response indicates she understood none of what Officer Ratcliffe stated or asked.  For this reason, it can hardly be said Ms. Reyna understood the passing statement of "it's up to you" as information of her right to refuse consent.

At no other time during the pre-search interaction did Officer Brown or Officer Ratcliffe provide a clearer statement to Ms. Reyna that she had a right to refuse consent.  This fact is particularly important here because Mr. Reyna indicated multiple times that she was uncertain she had authority to provide consent because she did not own the house.  (*See id.* 7:45– 7:46 ("I don't want to let anyone in[]. . . Because this is his house…"); 8:27 ("I don't know. This is his house."); 8:42 ("no this is his house").)  In this situation, the officer's statement, "it's up to you," even if properly understood, could lead to increased confusion or be construed as manipulation given Ms. Reyna's repeated uncertainty about her ability to provide consent and her lack of understanding about her right to refuse.

A review of the totality of circumstances surrounding Ms. Reyna's eventual and ultimate acquiesces to the search demonstrates that her decision was not voluntarily given.  The evidence demonstrates that Ms. Reyna was uncertain about her ability to provide consent and unaware of her right to refuse consent.  This created an increasingly confusing situation made worse by the officers' continued statements and requests to search the residence.  Under these circumstances, it cannot be said the Ms. Reyna provided voluntary consent to enter the residence.

The Court notes Defendant makes one additional argument that consent was involuntary, which requires an expansion of the Supreme Court's decision in *Georgia v. Randolph*, 547 U.S. 103 (2006).  In *Randolph*, the Court held when two co-occupants of a residence are present and one consents while the other does not, a subsequent search is not constitutional.  *Id.*  Defendant asserts Ms. Reyna's statement "I don't want to let you in. . . [t]his is his house and it would just be even worse for me. . .  [i]t's not my house[,]" put the officers on notice that Defendant, Ms. Reyna's co-occupant, would not have consented to the search if he were present.  (ECF No. 36 at

11.)  Defendant argues, because the officers were put on notice that Defendant would likely not have given consent, any entrance into the residence was improper.  (*Id.*)  The Court disagrees.  Though creative, Defendant's argument cannot be squared with the holding in *Randolph*.  Central to the holding in *Randolph* was the co-occupant's presence and statements declining consent to enter.  *Randolph*, 547 U.S. at 113–116.  Indeed, it was the disputed permission that gave rise to the Fourth Amendment violation in *Randolph*.  *Id.* at 115–116.  Accordingly, in the instant case, where the potentially objecting co-occupant is not present *Randolph* does not apply.  Any finding to the contrary would create a rule where the possibility that a non-present co-occupant may decline consent could defeat the consent of a present occupant.  Such a rule is not in line with *Randolph*.  *Id.* (holding, "[t]his case invites a straightforward application of the rule that a *physically present* inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant") (emphasis added.)

The Court finds, based on the totality of the circumstances, Ms. Reyna did not voluntarily consent to the Officer's entering or searching the residence.

### C.   Officer Ratcliffe Exceeded the Scope of Consent.

Even assuming arguendo that Ms. Reyna provided voluntary consent, the Officers exceeded the scope of the consent in their search of the residence.  "It is a violation of a suspect's Fourth Amendment rights for a consensual search to exceed the scope of the consent given."  *United States v. McSweeney*, 454 F.3d 1030, 1034 (9th Cir. 2006) (citing *Florida v. Jimeno*, 500 U.S. 250, 252 (1991)).  The standard for measuring the scope of consent under the Fourth Amendment is that of objective' reasonableness — "what would the typical reasonable person have understood by the exchange between the officer and the [consenting person]?"  *Jimeno*, 500 U.S. at 251.  Accordingly, the test is an objective one, and "a search pursuant to consent is limited by the extent of the consent given for the search by the individual.  *Id.* at 809–810; s*ee also United States v. Johnson*, No. 14-CR-00412-TEH, 2015 WL 4776096, at *2 (N.D. Cal. Aug. 13, 2015), *aff'd*, 875 F.3d 1265 (9th Cir. 2017).

Defendant argues Officer Ratcliffe exceeded the scope of Ms. Reyna's consent by lifting the clothing to find the receipt and doing more than looking for obvious matters of huge concern.

(ECF No. 36 at 13.)  Specifically, Defendant argues "[t]he officers' authority to search the house was limited to the request to 'look around to make sure there's nothing obvious that strikes [the officers] as a huge concern.'"  (*Id.*)  The Government disagrees.  The Government argues the officers did not exceed the scope of consent because the "stated purpose of the search was to look for evidence of Defendant's firearms manufacturing activities and to look for a storage unit receipt."  (ECF No. 39 at 9.)  The Government also argues Ms. Reyna's failure to withdraw or limit consent indicates she consented to Officer Ratcliffe re-entering the Game Room and looking for the storage receipt.  (*Id.* at 10.)

The Court finds Officer Ratcliffe exceeded the scope of Ms. Reyna's consent when he searched items, documents, areas, and containers in the Game Room and garage.  This includes the search of the clothing pile that uncovered the receipt.  The scope of consent in this case is narrow and specific.  Officer Ratcliffe was denied consent on at least one prior instance before finally obtaining consent from Ms. Reyna.  Indeed, when he first asked for broad consent to look around the residence, asking "[c]an we take a look at that real quick," Ms. Reyna declined. (Ratcliffe BWC at 4:29–4:42.)  Ms. Reyna only provided consent after Officer Ratcliffe significantly narrowed his request, explicitly stating he would "just take a look in the house real quick" and specifying "I'm not going to go search anything, but I'd like to just take a look around to make sure that there's nothing obvious that strikes me as a huge concern."  (*Id.* at 24:33.) Officer Ratcliffe's request was self-limiting, allowing the officers to "look around" but not to "search anything."  (*Id.*)  A reasonable person hearing this would think an officer could look around the residence — anything in plain view would be fair game — but an officer would not be able to physically engage in a search, rummaging through items, moving items, looking inside containers, etc.  In other words, Ms. Reyna's consent allowed the officers to walk around the residence, to "look" for anything that may be a huge concern.  It explicitly did not allow the officers to engage in a "search."  Therefore, whenever the officers wished to do more than look around, when the officers wished to "search," they were required to obtain additional consent from Ms. Reyna, which they did on at least three occasions.  (*See* Ratcliffe BWC at 28:58, 29:22, 42:46.)

1    The Government's argument to the contrary is unpersuasive.  The Government contends

2    the scope of the search extended to "evidence of Defendant's firearms manufacturing and to look

3    for a storage unit receipt."  (ECF No. 39 at 9.)  This is unsupported by the evidence.  The

4    Government is correct that during the officers' conversation with Ms. Reyna there was mention of

5    Defendant's manufacturing of firearms and Officer Ratcliffe mentioned wanting to look for a

6    storage unit receipt.  (*See* Ratcliffe BWC at 6:29, 7:51.)  However, this was almost twenty-

7    minutes prior to Ms. Reyna providing consent for the officers to enter.  (*See* Ratcliffe BWC at

8    7:51(stating "maybe there's a receipt in there", 24:57 (consent given).)  During this almost

9    twenty-minute temporal gap, the officers never again mentioned wanting to search for a receipt.

10   But even if they had, the clear and unambiguous limitations self-imposed by Officer Ratcliffe

11   when obtaining Ms. Reyna's consent would still have prevented him from engaging in the

12   physical search which uncovered the receipt.  Again, Ms. Reyna consented to the officers

13   "tak[ing] a look in the house real quick" but not to "search[] anything."  (*Id.* at 24:33.)

14   The Government's argument that Ms. Reyna's failure to withdraw or limit consent is also

15   unavailing.  (ECF No. 39 at10.)  The Government relies on *United States v. Mines* and *United*

16   *States v. Cannon* to support this argument.  In *Mines*, the Court determined that Mines's failure to

17   withdraw or limit his consent, even during the search, indicated he consented to the entire search.

18   883 F.2d 801, 805 (9th Cir. 1989).  *Mines* involved the search of Mines's luggage at an airport.

19   The facts indicate Mines consented to the search of his luggage and his luggage was searched in

20   his presence where he could easily object to the search at any time.  (*Id.* at 802–803.)  That is not

21   the case here.  When Officer Ratcliffe engaged in the unlawful search of the Game Room that

22   uncovered the receipt, Ms. Reyna was not in the room, had no view of Officer Ratcliffe, and was

23   answering questions posed by Officer Brown in the hallway.  (Brown BWC at 32:48–34:23.)

24   Similarly, Ms. Reyna was not present in the garage when Officer Ratcliffe engaged in several

25   searches outside the scope of Ms. Reyna's consent there.  Ms. Reyna was inside the house tending

26   to her child and responding to questions from Officer Brown.  (Brown BWC 35:21–41:12.)

27   *United States v. Cannon* involved a search of a car where the defendant provided consent

28   to search the vehicle.  29 F.3d 472, 474 (9th Cir. 1994).  During the search of the vehicle, Cannon

1    was present and did not protest when the officer searched under the hood, the passenger

2    compartment, and inside the trunk.  *Id.*  The search appears to have occurred in front of/in view of

3    Cannon.  *Id.*  *Cannon* is thus inapposite to the instant case.  Ms. Reyna could not have objected to

4    the expanded searches by Officer Ratcliffe because the searches occurred outside of Ms. Reyna's

5    view and presence.  Accordingly, the Court rejects the Government's arguments.

6         The Court finds Officer Ratcliffe exceed the scope of Ms. Reyna's consent when he did

7    more than "take a look in the house."  The officers in the instant case were free to walk through

8    the residence with Ms. Reyna, to ask for additional consent when needed, and to use any evidence

9    they observed in plain sight against Defendant.  However, the officers were not free to engage in

10   more invasive searches.  This includes the search of the clothing pile and box in the Game Room

11   that uncovered the storage unit receipt, the search of the bag next to the receipt in the Game room,

12   and any search within the garage that involved the physical movement or touching of items.

13              D.    The Good Faith Exception to the Exclusionary Rule Does Not Apply

14        "The exclusionary rule has traditionally been driven by one primary policy consideration:

15   the deterrence of unconstitutional acts by law enforcement."  *United States v. Jobe*, 933 F.3d

16   1074, 1078 (9th Cir. 2019) (citing *United States v. Calandra*, 414 U.S. 338, 348 (1974) ("[T]he

17   [exclusionary] rule is a judicially created remedy designed to safeguard Fourth Amendment rights

18   generally through its deterrent effect . . .")); *see also United States v. Leon*, 468 U.S. 897, 909

19   (1984).  The rule prevents police from benefiting from evidence obtained by means of a

20   constitutional violation, thereby removing the incentive to violate the Constitution to obtain

21   evidence.  *See, e.g.*, *United States v. Artis*, 919 F.3d 1123, 1133–34 (9th Cir. 2019); *United States*

22   *v. Camou*, 773 F.3d 932, 944–45 (9th Cir. 2014).  In cases where a search warrant is issued based

23   on evidence illegally obtained by police, a court must determine whether the police misconduct

24   that led to the discovery of the illegally obtained evidence is subject to the good-faith exception.

25   *Artis*, 919 F.3d at 1133.  Evidence discovered through conduct that "is plainly unconstitutional" is

26   not subject to the good faith exception.  *Id.*  In such a case, the good faith exception fails, and the

27   exclusionary rule applies.  *Id.*  The government bears the burden of establishing the good-faith

28   exception.  *See United States v. Underwood*, 725 F.3d 1076, 1085 (9th Cir. 2013).

13

1    Here, the Government argues Task Force Officer ("TFO") Oliver authored the state search

2    warrant for the storage unit based on information provided to him by Officer Ratcliffe.  (ECF No.

3    39 at 11.)  The Government asserts that Officer Oliver acted in good faith in obtaining the warrant

4    based on the information from Officer Ratcliffe, and the officers who executed the search

5    warranted acted in good faith in searching Defendant's storage unit.  (*Id.* at 12.)  For this reason,

6    the Government argues the good faith exception applies.  The Court disagrees.

7    The Government's argument is premised on a misapplication of established law.  The

8    question here is not whether Officer Oliver acted in good faith, but rather whether Officer

9    Ratcliffe's unconstitutional acts can be excused because of good faith.  It may be true that Officer

10    Oliver acted in good faith to obtain the warrant based on the information received by Officer

11    Ratcliffe.  But if the evidence obtained by Officer Ratcliffe was obtained through unconstitutional

12    means not subject to the good-faith exception, any subsequent good faith efforts are irreparably

13    tainted.  *See Artis*, 919 F.3d at 1133–34.

14    In the instant case, as discussed above, the Court finds Officer Ratcliffe exceeded the

15    scope of Ms. Reyna's consent when he picked up and moved clothing to access what appeared to

16    be a blank sheet of paper, picked-up that piece of paper, saw it was a receipt, and took a photo of

17    it.  The Court also found Officer Ratcliffe exceeded the scope of Ms. Reyna's consent when he

18    opened containers and moved objects in Defendant's garage without obtaining additional consent

19    from Ms. Reyna as he did when he opened a bin the Game Room and a cabinet in the kitchen.

20    Based on the evidence before the Court, these searches were deliberate acts and a clear violation

21    of the Fourth Amendment.  In reviewing the BWC footage, it appears the officers' unlawful

22    conduct was "sufficiently deliberate that it can be deterred through the exclusion of the fruits of

23    the illegal search and sufficiently culpable to warrant imposition of that sanction."  *Id.* at 1134

24    There is no evidence in the record supporting a contrary conclusion that the good-faith exception

25    should apply, and the Government presents none.  *See United States v. Rucks*, No. 2:20-CR-

26    00001-KJM-1, 2022 WL 16639330, at *10–11 (E.D. Cal. Nov. 2, 2022).  For this reason, the

27    Court finds the evidence supporting the warrant for the storage unit is tainted by the unlawful

28    search, this taint renders the good faith exception to the search warrant inapplicable, and thus the

14

1    exclusionary rule applies.

2                    E.        The Government has Failed to Establish Inevitable Discovery

3          "If the prosecution can establish by a preponderance of the evidence that the information

4    ultimately or inevitably would have been discovered by lawful means. . . then the deterrence

5    rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Nix v.*

6    *Williams*, 467 U.S. 431, 444 (1984).  In other words, if "by following routine procedures, the

7    police would inevitably have uncovered the evidence[,]" then the evidence should not be

8    suppressed.  *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989).  This

9    exception ensures the police are put "in the same, not a worse, position than they would have

10   been in if no police error or misconduct had occurred." *Nix*, 467 U.S. at 443.

11         The Government argues had Officer Ratcliffe not exceeded the scope of Ms. Reyna's

12   consent, officers would have inevitably found the receipt that formed the basis for the search

13   warrant.  (ECF No. 39 at 12.)  This is because Ms. Reyna informed officers Defendant "took off

14   because he had to take his guns to the storage unit, because he can't have guns."  The

15   Government contends because the officers knew Defendant was a convicted felon who may

16   currently possess, manufacture, and/or sell guns, and who had a couple of storage units, the

17   "officers would have obtained a warrant to search the house for evidence of illegal firearm

18   manufacturing and felon in possession of a firearm." (*Id.* at 13.)  In other words, the Government

19   argues the officers "had sufficient probable cause for the warrant based on the information

20   obtained from Ms. Reyna before they ever sought her consent."  (*Id.*)  This argument is

21   unpersuasive.

22         As this Court has noted before, the inevitable discovery exception does not apply "where

23   the police had probable cause but simply did not attempt to obtain a warrant."  *United States v.*

24   *Vicente Arauza*, No. 2:18-CR-00202-TLN, 2020 WL 3402408, at *4 (E.D. Cal. June 19, 2020)

25   (citing *United States v. Mejia*, 69 F.3d 309, 320–21 (9th Cir. 1995).)   Indeed, "[t]o apply the

26   inevitable discovery doctrine whenever the police could have obtained a warrant but chose not to

27   would in effect eliminate the warrant requirement."  *Mejia*, 69 F.3d at 320.  In the instant case,

28   the Government is correct that Ms. Reyna provided the officers information regarding

                                                    15

1   Defendant's possible unlawful possession, manufacturing, and sale of firearms.  It is also correct

2   that these statements could have provided probable cause for a warrant to search Defendant's

3   residence.  These facts, however, do not trigger the inevitable discovery exception.  The officers

4   may have had probable cause that could have allowed them to get a warrant.  However, the

5   officers never obtained such a warrant and the mere fact that probable cause may have existed

6   does not excuse the Fourth Amendment violation here.  *See id.*

7       The Government also argues the officers would have inevitably discovered the storage

8   unit. (ECF No. 39 at 13.)  To support this argument, the Government notes "[t]here is a finite

9   amount of mini storage locations in Woodland, and a finite number of persons matching

10   Defendant's description driving a silver Porsche sedan from Sacramento to Woodland." (*Id.*)

11   The Government contends "[i]f officers had not located the First Rate Storage receipt, they would

12   have immediately begun surveilling the community for Defendant and investigating to find his

13   storage unit." (*Id.*)  This argument lacks factual support.  Though there may be a finite number of

14   mini storage locations in Woodland and a finite number of persons matching Defendant's

15   description driving a silver Porsche from Sacramento to Woodland, there is no evidence before

16   the Court that the officers would have "begun surveilling the community for Defendant" or

17   "investigating to find his storage unit." (*Id.*)  The Government has provided no declarations,

18   radio traffic transcripts, reports, procedures, or other documents or evidence that could or would

19   demonstrate any such surveillance or investigation would have occurred.  The evidence currently

20   before the Court is silent as to what would have happened had the receipt not been found.

21   Accordingly, the Court finds the Government has not met their burden to demonstrate the

22   inevitable discovery exception should apply.

23       **IV.   CONCLUSION**

24       For the foregoing reasons, the Court GRANTS Defendant's motion to suppress evidence.

25   (ECF No. 36.)  All evidence obtained from the unconstitutional searches of the clothing pile and

26   box in the Game Room, the bag next to the clothing pile in the Game Room, and any search

27   within the garage that involved the physical movement or touching of items, is excluded.  This

28   includes the storage unit receipt.  Any fruits of this search are also excluded.

16

1    Because the warrant issued on March 31, 2022, (ECF No. 39, Exhibit 1) was inextricably

2    rooted in information obtained from the unconstitutional searches above, the warrant is tainted by

3    these unconstitutional searches and all fruits, including the search of the 1520 East Main Street,

4    Unit 647, in Woodland, California, 95776, and of Defendant's rental Porsche with California

5    license plate number 8YHR315, are excluded.

6    Within seven days of the date of this Order the parties shall meet and confer and provide

7    the Court with a proposed date for a status conference.

8    IT IS SO ORDERED.

9    Dated:  July 25, 2023

10

11    _____
      Troy L. Nunley
12    United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28